UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Cindy Marie McCusker**

v.

Case No. 19-cv-853-PB
Opinion No. 2020 DNH 196

**Andrew Saul, Commissioner**
**Social Security Administration**

MEMORANDUM AND ORDER

Cindy Marie McCusker challenges the denial of her application for disability insurance benefits pursuant to 42 U.S.C. § 405(g). She contends that the Administrative Law Judge ("ALJ") committed reversible errors in evaluating her residual functional capacity and relying upon faulty vocational expert testimony. The Commissioner, in turn, moves for an order affirming the ALJ's decision. For the following reasons, I deny McCusker's motion and grant the Commissioner's motion.

## I.   BACKGROUND[1]

### A.   Procedural Facts

McCusker is a 52-year-old woman with high school education. She worked as an office manager until November 2014, when she was forced to resign because she could no longer perform the duties of her job. She alleged disability beginning that month,

---

[1] I recount here only those facts relevant to the instant appeal. The parties' more complete recitations in their Statements of Material Facts (Doc. No. 10 & 11) are incorporated by reference.

due to right lateral epicondylitis (tennis elbow), a right
extension tendon tear, arthritis, fibromyalgia, hypothyroidism,
depression, and asthma.

McCusker's application was initially denied in August 2016.
In June 2017, she testified at a hearing before ALJ Joshua
Menard, who ultimately denied her claim.  The Appeals Council,
however, granted her request for review and remanded the case to
the ALJ in April 2018.  The Appeals Council directed the ALJ to
further consider McCusker's maximum residual functional capacity
("RFC") and to obtain supplemental testimony from a vocational
expert concerning the effect of the assessed limitations on
McCusker's occupational base.

ALJ Menard held a second hearing in January 2019, which
included testimony from McCusker, an impartial medical expert,
and a vocational expert.  The ALJ subsequently issued another
unfavorable decision.  See Tr. 12-27.  The Appeals Counsel later
denied McCusker's request for review, rendering the ALJ's
decision the final decision of the Commissioner.  See Tr. 1-4.
McCusker now appeals.

**B.   <u>Medical Evidence</u>**

In September 2014, rheumatologist Dr. John Shearman
diagnosed McCusker with lateral epicondylitis of the right arm
due to overuse syndrome.  Tr. 461-62.  He wrote a letter
indicating that she may need to miss work during flare-ups of

2

elbow pain, and he recommended that she work only four days a
week.  Tr. 468.  In November 2014, Dr. Shearman recommended that
McCusker remain out of work.  Tr. 469.  He did not record any
medical findings to support that recommendation.  Instead, he
noted that McCusker had reported that she was dropping things
and having difficulty lifting a coffee cup.  See Tr. 457-64.

McCusker saw Dr. Bruce Myers, a physiatrist, in December
2014, complaining of right elbow and wrist pain.  Tr. 591.  His
examination showed that she had reduced grip strength, pinch
strength, and range of motion in her right arm.  Tr. 592.  Dr.
Myers cleared McCusker for full-time work with the following
restrictions: no lifting more than ten pounds, only occasional
reaching and fine motor activities with the right arm, no
repetitive right elbow motions, and no more than forty minutes
per hour of combined writing and computer use.  Tr. 543.

The following month, Dr. Myers' colleague, Peter
Attenborough, PA-C, noted that McCusker's right elbow pain had
improved significantly after a cortisone injection, but she
continued to report right wrist pain.  Tr. 585.  Upon
examination, she had right wrist and elbow tenderness, with
normal range of motion in both.  Tr. 586.  Mr. Attenborough
referred her to occupational therapy.  Tr. 587.  After a month
of occupational therapy, McCusker's symptoms were slowly
improving.  See Tr. 529.  Meanwhile, a right wrist ultrasound

showed a very small effusion, very mild spurring at the
scapholunate joint, and no evidence of tenosynovitis, erosive
arthritis, or joint instability.  Tr. 584.

In February 2015, Dr. Myers indicated on a workers'
compensation medical form that McCusker could lift twenty-five
pounds and was no longer limited in her ability to reach with
her right arm.  Tr. 547.  She showed signs of pain and
tenderness in her right elbow and wrist during examinations in
February and March 2015, but she still had normal range of
motion in both.  See Tr. 579, 583.

Mr. Attenborough filled out a workers' compensation medical
form on McCusker's behalf in May 2015, noting that she continued
to complain of persistent right elbow pain.  Tr. 550.  He wrote
that she could continue working, but she could lift less than
ten pounds, could reach and drive occasionally, and could not do
repetitive motions with her right wrist and elbow.  Tr. 550.
According to Mr. Attenborough's progress note from the same day,
McCusker's strength and functioning had improved since she
started occupational therapy, and she was "attempting to use the
right arm mor[e] normally."  Tr. 571.  At the same time, he
noted tenderness and reduced range of motion in her right elbow
and wrist upon examination.  Tr. 572.  Mr. Attenborough
recommended further occupational therapy, a splint, and low

4

doses of ibuprofen for her wrist, as well as an ultrasound and possible cortisone injection for her elbow.  Tr. 573.

A June 2015 ultrasound showed a "triangular anechoic defect" in McCusker's right elbow, consistent with an extensor tendon tear.  Tr. 570.  Her right wrist appeared essentially normal on the ultrasound.  Tr. 570.  A follow-up MRI of the right wrist showed trace joint effusion, mild tenosynovitis, and a small cyst.  Tr. 558-59.  Dr. Myers subsequently recommended tendon surgery for her elbow and Medrol for her wrist.  Tr. 567.

McCusker saw orthopedist Dr. David Thut for a consultative examination in July 2015.  Tr. 625.  She had pain and weakness in her right elbow, but her range of motion and sensation were intact.  Tr. 627.  Dr. Thut determined that she was fit to return to work, with a restriction to lifting ten pounds at most (five pounds frequently) and no reaching.  Tr. 628.  She had no limitations on her ability to bend, sit, stand, walk, or perform fine motor activities.  Tr. 628.  Dr. Thut filled out a workers' compensation medical form with similar restrictions on October 15, 2015.  Tr. 622; see also Tr. 639 (declaring her "[f]it for work" with modifications).

Later that month, Dr. Thut performed a surgery on McCusker's right elbow.  Tr. 601.  The procedure was a debridement of the right common extensor tendon and a repair to the bone of that tendon.  Tr. 601.  Nine days after the surgery,

5

Dr. Thut declared McCusker unfit "for work of any sort at this time," but he noted that she had not yet reached maximum medical improvement.  Tr. 643.  In early December, Dr. Thut cleared McCusker for work that involved lifting no more than five pounds, occasional reaching, and limited grasping with her right arm.  Tr. 624, 647.  In January 2016, twelve weeks after the surgery, Dr. Thut filled out a form indicating that the only limitations to McCusker's right arm functioning were lifting five pounds and occasional reaching.  See Tr. 649, 651.

Meanwhile, Mary Ann Johnson APRN, McCusker's primary care provider, contradicted Dr. Thut's work assessment.  From December 2015 to February 2016, she filled out workers' compensation forms indicating that McCusker could not work and could not do any lifting with her right arm.  See Tr. 775, 784, 800.  In February 2016, McCusker continued to report ongoing difficulty with her right elbow, including significant pain, to Nurse Johnson, who increased her pain medication and recommended that she get a second orthopedic opinion.  See Tr. 801-04.

McCusker presented to orthopedist Dr. Nicholas Horangic for a second opinion in May 2016.  She reported no improvement after surgery, ongoing burning sensation in her right dorsal forearm, numbness and tingling in her middle and ring fingers, and pain with activities involving extension and supination.  Tr. 822. She described her pain as 8/10 regularly and 10/10 with use.

Tr. 822.  Her grip strength on the right was five pounds,
compared to fifty-five pounds on the left.  Tr. 823.  Dr.
Horangic diagnosed her with persistent right elbow pain and
symptoms consistent with a radial tunnel syndrome.  Tr. 823.
Dr. Horangic filled out workers' compensation paperwork
indicating that McCusker could not work, but he did not specify
any restrictions.  See Tr. 942-43.  He submitted the same
paperwork three more times through April 2017.  See Tr. 944-49.

In August 2016, McCusker presented to neurologist Dr. Jorge
Almodovar Suarez for nerve testing, following a referral from
Dr. Horangic.  Tr. 908.  Upon examination, Dr. Almodovar Suarez
noted that McCusker had normal motor functioning, full strength
(albeit with some pain during motion testing of her right arm),
and normal sensation.  Tr. 910-13.  He stated, however, that the
examination was "not reliable, since I am not able to get full
effort from the patient."  Tr. 913.  Dr. Almodovar Suarez
suspected mononeuropathies and complex regional pain syndrome as
"part of the differential diagnosis."  Tr. 913.  An EMG/nerve
conduction study he commissioned, however, did not support
either diagnosis, as the results were essentially normal.  See
Tr. 914, 917, 995.

Dr. Horangic subsequently recommended lateral epicondylar
steroid injections, and McCusker agreed.  Tr. 915.  In January
2017, however, McCusker reported that her symptoms had returned

7

two weeks after the injections.  Tr. 920.  Dr. Horangic's exam
at that time showed maximum area of tenderness over the lateral
epicondyle and radial tunnel, as well as severe pain with
resisted wrist extension and resisted finger extensions.  Tr.
920.  Dr. Horangic recommended a radial tunnel blockade, which
was performed in February 2017 and yielded only temporary
relief.  See Tr. 952.  McCusker discussed with Dr. Horangic the
possibility of a revision surgery on several occasions.  See Tr.
920, 953.

In March 2017, McCusker underwent an independent medical
examination with orthopedic surgeon Dr. Kenneth Polivy.  See Tr.
980-84.  Upon examination, her right elbow was tender to
palpation, and she reported a burning sensation along the ulnar
groove, but she had full range of motion in her right shoulder,
wrist, and hand, with intact sensation and a negative Tinel's
sign.  Tr. 982-83.  She also had a "mild subjective decrease in
strength in the right hand, with reports of pain in the elbow
while shaking the hand."  Tr. 983.  Her spine and other
extremities appeared normal.  Tr. 982-83.  Dr. Polivy opined
that she had a 20% loss of grip strength, which translated to an
"8% permanent impairment of the right upper extremity."  Tr.
983.  He noted that she "should be capable of full-time, light
duty work activity with a 5[-]pound lifting restriction and

8

limited repetitive use of the right hand," which meant no "prolonged keyboarding."  Tr. 984.

The following month, Dr. Horangic noted that McCusker showed signs of ulnar neuropathy during a clinical examination, and he recommended repeat electrodiagnostic testing to confirm. Tr. 952-53.  The testing, however, showed no evidence of right ulnar neuropathy or right-sided cervical radiculopathy.  See Tr. 995.  There was "[m]ildly prolonged distal latency," but it was "not significant enough to meet the criteria for abnormality." Tr. 995.  The study prompted Dr. Horangic to rule out carpal tunnel syndrome and right ulnar neuropathy as diagnoses.  Tr. 1000-01.

In May 2017, Dr. Horangic completed a medical source statement on McCusker's behalf.  See Tr. 961-66.  He opined that she should never use her right dominant arm to lift, carry, reach, handle, finger, feel, push or pull.  Tr. 961, 963.  Dr. Horangic also indicated that she should never climb ladders or scaffolds, balance, stoop, kneel, crouch, crawl, or work in unprotected heights, with moving mechanical parts, or in humidity and wetness.  Tr. 964-65.  When asked to identify the medical or clinical findings supporting his assessment, Dr. Horangic declined to answer.  See Tr. 961, 963-65.

Nurse Johnson, McCusker's primary care provider, also completed a medical source statement that same month.  See Tr.

9

968-73.  She opined that McCusker could occasionally lift and carry ten pounds with her right arm, occasionally reach, handle, push and pull with that arm, occasionally kneel or crouch, and never crawl or climb ladders or scaffolds.  Tr. 968, 670-71.

McCusker returned to Dr. Horangic in March 2018, reporting that she continued to have pain in her right elbow, as well as burning sensation at the ulnar level in the cubital tunnel and numbness and tingling in her right ring and pinky fingers.  Tr. 1000.  Dr. Horangic recommended right elbow surgery to address her lateral right elbow and radial tunnel symptoms.  Tr. 1001.  He performed that surgery in August of that year.  Tr. 1142-43.  Two weeks after surgery, Dr. Horangic noted that she was "doing well" and cleared her to resume "full elbow[,] forearm[,] wrist and hand range of motion" and to lift no more than five pounds with her right arm.  Tr. 1210.

Impartial medical expert Dr. Joseph Gaeta testified at the January 2019 hearing based on his review of the entire medical record.  See Tr. 85-103.  He opined that McCusker still retained some functional capacity in the right arm despite her symptoms, specifying that she could lift and carry five pounds, as well as occasionally push, pull, and reach with that arm.  Tr. 88-89, 97-98.  Dr. Gaeta testified that Dr. Horangic's May 2017 opinion that McCusker could never do anything with her right arm was "too restrictive."  Tr. 90.  Dr. Gaeta questioned Dr. Horangic's

objectivity, noting that Dr. Horangic had checked boxes
indicating that McCusker could never kneel, crouch, stoop, or
balance, even though her right arm impairment would not have
affected any of those activities and there was no evidence of
other impairments supporting those limitations.  Tr. 91-92.  Dr.
Gaeta acknowledged that imaging studies confirmed a right arm
impairment, but he explained that those images did "not relate
to the function of the extremity."  Tr. 92-93.

## C.   **The ALJ's Decision**

The ALJ assessed McCusker's claim under the five-step,
sequential analysis required by 20 C.F.R. § 404.1520.  At step
one, he found that McCusker had not engaged in substantial
gainful activity since November 17, 2014, her alleged disability
onset date.  Tr. 17.  At step two, the ALJ found that her
chronic right lateral epicondylitis of the right arm was a
severe impairment.  Tr. 17.  The ALJ also found that her
degenerative disc disease, migraines, and thyroid disorder were
not severe impairments.  Tr. 17.  At step three, the ALJ
determined that none of McCusker's impairments, considered
individually or in combination, qualified for any impairment
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 19;
see 20 C.F.R. § 404.1520(d).  The ALJ then found that McCusker
had the RFC to perform light work as defined in 20 C.F.R.
§ 404.1567(b), except she could only lift and carry five pounds

with her right arm, could occasionally push and pull, reach
overhead, and reach in all other directions with her right arm,
and could never climb ladders, ropes or scaffolds.  Tr. 19.

The ALJ gave "great weight" to Dr. Gaeta's opinion, finding
it consistent with, and well supported by, the medical evidence.
Tr. 22.  The ALJ gave "little weight" to the opinions of
McCusker's treating providers, including Dr. Thut, Dr. Horangic,
and Dr. Myers.  Tr. 22-25.

Relying on the testimony of a vocational expert, the ALJ
then found at step four that McCusker could not perform her past
relevant work.  Tr. 25.  However, the ALJ found at step five
that other jobs existed in the national economy that McCusker
could perform, including a furniture rental clerk, usher, and
school bus monitor.  Tr. 26.  Accordingly, the ALJ concluded
that McCusker had not been disabled from the alleged disability
onset date through the date of his decision.  Tr. 26-27.

## II.  <u>STANDARD OF REVIEW</u>

I am authorized to review the pleadings submitted by the
parties and the administrative record and enter a judgment
affirming, modifying, or reversing the "final decision" of the
Commissioner.  See 42 U.S.C. § 405(g).  That review is limited,
however, "to determining whether the [Commissioner] used the
proper legal standards and found facts [based] upon the proper
quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d

652, 655 (1st Cir. 2000).  I defer to the Commissioner's findings of fact, so long as those findings are supported by substantial evidence.  Id.  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. The Commissioner's findings are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotation marks and brackets omitted).

### III.  ANALYSIS

McCusker alleges that any one of four errors in the ALJ's decision warrants remand.  First, she contends that the ALJ

failed to evaluate her complex regional pain syndrome in accordance with Social Security Ruling 03-2p.  Second, she argues that the ALJ improperly evaluated her complaints of fatigue and pain.  Third, McCusker argues that the ALJ's RFC finding is not supported by substantial evidence.  Finally, she maintains that the ALJ's step five finding is flawed because he relied on vocational expert ("VE") testimony that was inconsistent with the Dictionary of Occupational Titles ("DOT") and did not clarify whether the job numbers cited by the VE included only full-time jobs.  I address each argument in turn and conclude that none has merit.

**A.   Evaluation of Complex Regional Pain Syndrome**

McCusker argues that the ALJ erroneously failed to consider her diagnosis of complex regional pain syndrome ("CRPS") of the right arm and to evaluate it under the standards set forth in Social Security Ruling ("SSR") 03-2p, 2003 WL 22380904 (Oct. 20, 2003).  McCusker does not specify at which step of the sequential analysis this purported error took place.  To the extent she is alleging that the ALJ should have found CRPS to be a severe medically determinable impairment at step two, she has not met her burden of demonstrating that reversal is warranted on this basis for two independent reasons.

First, the record does not support McCusker's contention that she was in fact diagnosed with CRPS.  Dr. Almodovar Suarez

did note that "[i]n addition to mononeuropathies, [CRPS] is part
of the differential diagnosis," but this was subject to an
EMG/nerve conduction study to confirm his suspicions.  See Tr.
913.  That testing did not support the diagnosis, as the results
were essentially normal.  See Tr. 914, 917, 995.  No other
medical provider diagnosed the condition either.  Accordingly,
the ALJ did not err in declining to accept CRPS as a medically
determinable impairment.

Second, where, as here, the ALJ finds at least one severe
impairment and continues the sequential analysis, any error at
step two is harmless "unless the claimant can demonstrate that
the error proved outcome determinative in connection with the
later assessment of her residual functional capacity." Lawton
v. Astrue, 2012 DNH 126, 2012 WL 3019954, at *7 (D.N.H. July 24,
2012) (internal quotation marks and brackets omitted); accord
Gruhler v. Berryhill, 2017 DNH 252, 2017 WL 6512227, at *6
(D.N.H. Dec. 20, 2017).  McCusker has not met this burden.  The
ALJ did not ignore McCusker's right arm pain and related
limitations in her functioning when assessing her RFC.
Following numerous medical providers who treated McCusker's
symptoms without associating them with CRPS, the ALJ considered
them as symptoms of her chronic right lateral epicondylitis.  As
discussed further below, the ALJ supportably credited Dr.
Gaeta's opinion that, despite her symptoms, McCusker could

perform light work with certain restrictions that the ALJ
incorporated into the RFC finding, and he supportably discounted
McCusker's testimony that her pain effectively precluded her
from using her right arm.  Therefore, McCusker has not shown
that the ALJ erred in failing to identify CRPS as a severe
medically determinable impairment or otherwise committed a
reversible error when considering her associated symptoms in
crafting her RFC.

**B.    Evaluation of Subjective Complaints**

McCusker argues that the ALJ's RFC determination cannot
stand because the ALJ did not properly evaluate her complaints
of fatigue and pain.  I find that the ALJ supportably discounted
her subjective reports regarding the intensity, persistence, and
limiting effects of fatigue and pain as not entirely consistent
with the medical evidence and other evidence in the record.

In crafting a claimant's RFC, an ALJ must consider all of a
claimant's alleged symptoms and determine the extent to which
those symptoms can reasonably be accepted as consistent with
objective medical evidence and other record evidence.  20 C.F.R.
§ 404.1529(a); SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16,
2016).  This involves a two-step inquiry.  First, the ALJ must
determine whether the claimant has a "medically determinable
impairment" that could reasonably be expected to produce her
alleged symptoms.  SSR 16-3p, 2016 WL 1119029, at *3.  Second,

16

the ALJ evaluates the "intensity, persistence, and limiting effects of [those] symptoms" to determine how they limit the claimant's ability to perform work-related activities.  Id. at *4.  The ALJ must "examine the entire case record" in conducting this evaluation, including objective medical evidence, the claimant's own statements and subjective complaints, and any other relevant statements or information in the record.  Id.; see Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018).

The ALJ cannot disregard the claimant's statements about her symptoms solely because they are unsubstantiated by objective medical evidence.  See SSR 16-3p, 2016 WL 1119029, at *5.  Rather, an inconsistency between subjective complaints and objective medical evidence is just "one of the many factors" to consider in weighing the claimant's statements.  Id.

Other factors the ALJ must consider, known as the "Avery factors" in the First Circuit, include (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or symptom; (3) any precipitating and aggravating factors; (4) the effectiveness of any medication currently or previously taken; (5) the effectiveness of non-medicinal treatment; (6) any other self-directed measures used to relieve pain; and (7) any other factors concerning functional limitations or restrictions.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); see 20 C.F.R.

§ 404.1529(c)(3).  But the ALJ is not required to address every Avery factor in his written decision for his evaluation to be supported by substantial evidence.  Deoliveira v. Berryhill, 2019 DNH 001, 2019 WL 92684, at *5 (D.N.H. Jan. 2, 2019). Instead, the decision need only "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029, at *9.

At the hearing, McCusker testified that she was constantly fatigued as a side effect of her pain medication and needed to lie down frequently during the day.  See Tr. 64-65, 125-26.  She also testified that the medication only "takes the edge off" her pain, and that pain effectively precluded her from using her dominant right arm on a regular basis.  Tr. 119.  In fact, she stated that she could not even pick up a coffee cup with her right arm and could sign her name only by supporting her right hand with the left.  Tr. 119.  The ALJ gave sufficiently specific reasons for discounting McCusker's complaints of such disabling symptoms.

First, the ALJ cited the inconsistency between McCusker's complaints and the objective medical evidence.  The ALJ noted that the treatment records described her as comfortable or in no

acute distress, except for one visit when Nurse Johnson described her as in pain.  Tr. 22.  As the ALJ explained, "[t]hat this was only observed at one visit further suggests that it was an isolated presentation."  Tr. 22.  Similarly, the ALJ explained that the treatment notes did not describe McCusker as fatigued, despite her testimony that she was experiencing constant fatigue.  Tr. 22.  Further, McCusker's testimony that pain prevented her from even holding a coffee cup was inconsistent with both examinations showing that she had no sensory deficits and retained some strength and range of motion in her right arm, as well as the opinions of multiple medical sources that she could lift and carry at least five pounds with her right arm and had sufficient range of motion for other tasks.  Tr. 20-25.  The ALJ was entitled to consider those inconsistencies as a factor in evaluating McCusker's subjective complaints.

Second, the ALJ found McCusker's activities of daily living at odds with her endorsements of disabling pain and fatigue.  He noted that, apart from difficulty combing her hair, she did not report difficulties attending to her personal hygiene.  Tr. 22.  She also acknowledged doing house and yard work with pain, "which shows that she remained functionally capable despite the pain."  Tr. 22.  Lastly, she remained able to drive, which the

ALJ explained requires use of her right hand to turn the key in the ignition, change gears, and grip the wheel.  Tr. 22.

In short, the ALJ offered specific reasons, supported by the record, for discounting McCusker's statements concerning the intensity, persistence, and limiting effects of her fatigue and pain.  The ALJ's evaluation is, therefore, entitled to deference.

## C.   Challenge to Supportability of RFC Finding

McCusker also argues that the record, considered as a whole, does not support the ALJ's RFC finding.  Instead of finding fault with the evidence upon which the ALJ relied, she merely points to other evidence that she contends supports a more restrictive RFC.  To the extent she is asking me to reweigh the evidence, I cannot do so.  See Irlanda Ortiz, 955 F.2d at 769.  I can review only the sufficiency of the evidence, not its weight, and there was certainly evidence in the record that a reasonable person would accept as adequate to support the ALJ's RFC finding.  See id.

Notably, the ALJ relied most heavily on the opinion of Dr. Gaeta, the independent medical expert who testified at McCusker's second hearing based on his review of the entire record.[2]  Dr. Gaeta testified that, despite multiple surgeries,

---

[2] In his written decision, the ALJ referred to Dr. Kwock as the testifying independent medical expert instead of Dr. Gaeta.

continued symptoms, and persistent pain, McCusker retained some
degree of functioning with her right arm.  Specially, he opined
that McCusker could lift and carry five pounds, as well as
occasionally push, pull, and reach in all directions with her
right arm.  Tr. 88-89, 97-98.  The ALJ's RFC finding mirrors Dr.
Gaeta's opinion.  See Tr. 19.  The ALJ reasoned that Dr. Gaeta's
opinion was entitled to "great weight" because he "gave a well-
reasoned opinion that he supported with direct reference" to the
record evidence, and he had considered McCusker's functioning
over the entire relevant period.  Tr. 20.  The ALJ also reasoned
that Dr. Gaeta's opinion was generally consistent with the most
recent opinion of Dr. Thut, one of McCusker's surgeons.  See Tr.
22-23.  Although in the immediate post-operative period Dr. Thut
indicated that McCusker had limited work capacity and multiple
restrictions on using her right arm, in January 2016, he opined
that McCusker could lift five pounds and occasionally reach with
her right arm.  See Tr. 649, 651.  Dr. Thut did not impose any
other restrictions on her right arm functioning at that time.
See Tr. 651.  Further, Dr. Gaeta adequately explained why he
found Dr. Horangic's opinion endorsing further restrictions to

---

Having reviewed the ALJ's decision and Dr. Gaeta's testimony, I
conclude that this was a clerical error that does not constitute
grounds for remand.  See Ortiz v. Colvin, 298 F. Supp. 3d 581,
591 (W.D.N.Y. 2018) (collecting cases holding that the ALJ's
inadvertent use of the wrong name to refer to a doctor did not
affect the analysis and did not justify remand).

McCusker's right arm functioning unpersuasive, observing that Dr. Horangic had also imposed other restrictions that had no connection to her right arm impairment and no basis in the record.  See Tr. 91-92.

McCusker does not challenge the ALJ's weighing of the opinion evidence generally or Dr. Gaeta's opinion specifically. But even if she did, I conclude that the ALJ offered adequate reasons to account for the weight he assigned to Dr. Gaeta's opinion.  See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, . . . the more weight we will give that medical opinion."); id. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); id. § 404.1527(c)(6) ("[T]he extent to which a medical source is familiar with the other information in [a claimant's] case record [is among] relevant factors that we will consider in deciding the weight to give to a medical opinion.").  Accordingly, I conclude that the ALJ was entitled to rely upon Dr. Gaeta's opinion in crafting the RFC.

It is true, as McCusker points out, that there is other evidence in the record supporting further restrictions to her RFC.  The ALJ did not ignore the evidence on which McCusker relies; instead, he considered that evidence and reasonably found that it was inconsistent with other substantial evidence

in the record.  Because it is the ALJ's job to choose between
two conflicting views of the evidence, his RFC finding is
conclusive.  See Purdy, 887 F.3d at 13.

**D.    Step Five Challenges**

Finally, McCusker challenges the ALJ's finding at step five
of the sequential analysis that she could perform jobs in the
national economy such as a furniture rental clerk, usher, and
school bus monitor.  She argues that the ALJ erroneously relied
on the VE's testimony that a hypothetical claimant with the same
functional limitations as McCusker could perform those jobs
without resolving a conflict with the DOT and without clarifying
the nature and availability of the identified jobs.  Neither
argument has merit.

McCusker contends that the VE's testimony conflicts with
the DOT because the DOT does not address whether the jobs in
question can be performed when there are functional restrictions
on using one's dominant arm.  There is no conflict here.  The VE
used her experience to supplement the DOT in an area where the
DOT was silent, as she was permitted to do.  See SSR 00-4P, 2000
WL 1898704, at *2 (Dec. 4, 2000) ("Evidence from VEs . . . can
include information not listed in the DOT.").

Next, McCusker argues that the ALJ failed to determine
whether the number of jobs cited by the VE included part-time or
full-time jobs and when those jobs were available.  I have

previously rejected the same arguments, and McCusker cites no authority suggesting that a different outcome is warranted here. See Godin v. U.S. Soc. Sec. Admin., Acting Comm'r, 2017 DNH 239, 2017 WL 5515845, at *5-6 (D.N.H. Nov. 16, 2017). As I explained in Godin, there is no requirement that the VE testify to only full-time jobs, as opposed to part-time jobs. See id. In addition, here, as in Godin, the ALJ's questioning allows me to infer that he was referring to jobs that were currently available. See id.; see also Tr. 128. Accordingly, McCusker's challenges to the ALJ's step five finding fail.

## IV.   CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), I grant the Commissioner's motion to affirm (Doc. No. 12) and deny McCusker's motion for an order reversing the Commissioner's decision (Doc. No. 8). The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 10, 2020

cc: Christine Woodman Casa, Esq.
    Michael L. Henry, Esq.